# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-045

Filing Date: December 14, 2011

Docket No. 33,028

STATE OF NEW MEXICO ex rel.
HON. MIMI STEWART, HON. BEN LUJAN,
HON. ELEANOR CHAVEZ, HON. ANTONIO
LUJAN, HON. MIGUEL GARCIA, and HON.
CISCO McSORLEY, members of the New Mexico
Legislature and citizens of New Mexico,

      Petitioners,

v.

HON. SUSANA MARTINEZ,
Governor of the State of New Mexico,
HON. DIANNA J. DURAN, Secretary
of State of New Mexico, and HON.
CELINA BUSSEY, Secretary of New Mexico
Department of Workforce Solutions,

      Respondents,

and

HON. GARY KING, Attorney General of
the State of New Mexico,

      Intervenor.

ORIGINAL PROCEEDING
Freedman Boyd Hollander
Goldberg Ives & Duncan, P.A.
Joseph Goldberg
John W. Boyd
Michael L. Goldberg
Albuquerque, NM

for Petitioners

1

General Counsel, Office of the Governor
Jessica M. Hernandez
Jennifer L. Padgett
Matthew J. Stackpole
Santa Fe, NM

General Counsel, Department
of Finance & Administration
Gregory S. Shaffer
Santa Fe, NM

General Counsel
Workforce Solutions Department
Marshall J. Ray
Albuquerque, NM

for Respondents

Gary K. King, Attorney General
Mark Reynolds, Assistant Attorney General
Scott Fuqua, Assistant Attorney General
Santa Fe, NM

for Intervenor

**OPINION**

**CHÁVEZ, Justice.**

**I.     INTRODUCTION**

**{1}**     The New Mexico Legislature passed House Bill 59 during the 2011 legislative session.  H.B. 59, 50th Leg., 1st Sess. (N.M. 2011) [hereinafter H.B. 59].  House Bill 59 sought to amend five different sections of the Unemployment Compensation Law (the Act), NMSA 1978, §§ 51-1-1 to -59 (1936, as amended through 2010), in order to address the impending insolvency in the unemployment compensation fund.  In addition to reducing benefits to the unemployed, House Bill 59 increased employer contributions to the unemployment compensation fund over the contributions that would be made in 2011.  H.B. 59, § 51-1-11(I)(6).  Governor Susana Martinez partially vetoed House Bill 59 by striking one of the variables in Section 51-1-11(I)(6) that was necessary to calculate employer contributions beginning on January 1, 2012.  The Petitioners, each of whom are legislators, seek a writ of mandamus invalidating Governor Martinez's partial veto.  Because the effect of the partial veto was to exempt most employers from making what would otherwise be mandatory contributions to the unemployment compensation fund for calendar year 2012,

2

we hold that the partial veto was invalid. We therefore issue a writ of mandamus ordering that House Bill 59 be reinstated as passed by the Legislature.

## II. BACKGROUND

### A. *The Unemployment Compensation Law*

{2} When the Legislature first enacted the Act in 1936, the legislators found it worthwhile to include "[a]s a guide to the interpretation and application" of the Act, a "declaration of state public policy." 1936 N.M. Laws (Special Session), ch. 1, § 2. The declaration stated that

> [e]conomic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. . . . The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. *The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this State requires the enactment of this measure, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.*

*Id.* (restated as NMSA 1978, § 51-1-3) (emphasis added). The Act establishes an unemployment compensation fund and the parameters for unemployment benefit eligibility. *See generally* NMSA 1978, §§ 51-1-1 to -59. In relevant part to this Opinion, the Act establishes employers' rates of contribution to the unemployment compensation fund based on "benefit experience." *See* NMSA 1978, § 51-1-11 (2010). Less-established employers, who have not yet had "accounts chargeable" for thirty-six months, are charged a flat rate of two percent. *Id.* Subsection F. More-established employers, on the other hand, which have "accounts chargeable" with benefits for the preceding thirty-six months, contribute to the unemployment compensation fund on the basis of (1) *the employer's record*, and (2) *the condition of the fund*, according to Section 51-1-11(I). *See* § 51-1-11(F). There are exceptions to this framework for certain employers that have recently acquired other "employing units," *see* § 51-1-11(F)(1), and for certain employers conducting business outside New Mexico, *see* § 51-1-11(F)(2).

{3} Section 51-1-11(I) of the Act provides that the more-established employers' annual contribution rates are determined by the combined effect of two variables, a reserve rate ("Reserve Rate") assigned to each employer and an annual contribution rate schedule ("Contribution Schedule"). Section 51-1-11(I)(4) provides a chart called the "table of employer reserves and contribution rate schedules," which determines an employer's

contribution rate based on the intersection of the row representing the employer's Reserve Rate and the column representing the Contribution Schedule. *See* § 51-1-11(I)(4). The Reserve Rate is dependent on a particular employer's unemployment record; it is calculated "by the excess of the employer's total contributions over total benefit charges computed as a percentage of the employer's average payroll reported for contributions." Section 51-1-11(I)(1).

**{4}** In any given year, the Contribution Schedule is the same for all established employers. The Contribution Schedule ranges from Schedule 0 to Schedule 6. *See* § 51-1-11(I)(2)(a)-(g). Determining the relevant Contribution Schedule has varied over the years. During some years a statutory formula was applied to determine the relevant schedule, while during other years the Legislature specified which schedule would be applied for a given year. When determined by formula, the Contribution Schedule is inversely related to the condition of the unemployment compensation fund. Section 51-1-11(I)(2). The Contribution Schedule increases when the unemployment fund, as a percentage of total payrolls, decreases. *Id.* Likewise, when the amount in the fund becomes a larger proportion of total payrolls (i.e., the fund becomes healthier), the Contribution Schedule decreases, lowering employers' annual contribution rates. *Id.* Prior to House Bill 59, Section 51-1-11(I) of the Act provided that "for each calendar year *after 2011*," the Contribution Schedule to be applied depended on a calculation based on a statutory formula. Section 51-1-11(I)(2) (2010) (emphasis added). House Bill 59 amended Section 51-1-11(I)(2) by changing the effective date for calculating the Contribution Schedule by formula to "each calendar year *after 2012*." H.B. 59, § 51-1-11(I)(2) (emphasis added).

**{5}** In addition to delaying the onset of a formula-based Contribution Schedule, House Bill 59 set a fixed Contribution Schedule for the year 2012, making the variable independent from the relative health of the unemployment fund. *See* H.B. 59, § 51-1-11(I)(6), as passed by the Legislature ("[F]rom January 1, 2012 through December 31, 2012, each employer making contributions pursuant to this subsection shall make a contribution at the rate specified in Contribution Schedule 3."). It set the Contribution Schedule for 2012 at Schedule 3, higher than both the fixed Contribution Schedule in 2010 (Schedule 0), § 51-1-11(I)(6) (2010), and the fixed Contribution Schedule for 2011 (Schedule 1), *id.* (2011). Thus, under House Bill 59 as passed by the Legislature, the Contribution Schedule continued to be specified by the Legislature independent from the health of the unemployment compensation fund for 2011 and 2012, H.B. 59, § 51-1-11(I)(5)-(6), but set by formula beginning in 2013, H.B. 59, § 51-1-11(I)(2). Because the health of the fund is not known, it is not clear what the 2012 Contribution Schedule would be if it was set by the formula, a matter that gains importance with Governor Martinez's partial veto.

**B.** *Partial Veto to House Bill 59*

**{6}** Governor Martinez vetoed one substantive provision from House Bill 59, the

4

provision of Section 51-1-11(I) that fixed the 2012 Contribution Schedule at Schedule 3.[1] She explained her veto in an executive message:

> While solvency [of the unemployment compensation fund] is a legitimate concern, the rate increase [implemented by the Legislature] is not triggered by insolvency.
>
> The reason the contribution rate would increase is because the current law locking the rate at Schedule 1 will sunset on December 31, 2011. Once that law sunsets, the rate will again be determined by the floating calculation. To avoid the floating calculation, this bill arbitrarily sets the contribution rate at Schedule 3, beginning January 1, 2012. However, the legislature could have instead continued the contribution rate at Schedule 1 and thus prevented any tax increase, regardless of the status of the fund.

House Executive Message No. 40, 2011 Regular Session at 2. The "floating calculation" to which the Governor refers is the Contribution Schedule set by formula, as explained above. The "increase" to which the Governor refers must be a comparison of the fixed Contribution Schedule in 2011, Schedule 1, with the fixed Contribution Schedule in 2012, Schedule 3, because the formula-based schedule is not known. As previously mentioned, it is not clear if the formula-based Schedule would have been higher or lower than Schedule 3. What is clear, however, is that with either a floating Contribution Schedule or Schedule 3, all employers would have been obligated to make some level of contribution to the fund. The veto message expresses the intent to use the line-item veto to eliminate the "arbitrarily set" Contribution Schedule. By implication, Governor Martinez intended to continue the mandatory employer contributions, but at a lower rate.

{7}     The Governor's veto, however, did not accomplish a reversion to a "floating calculation" for the Contribution Schedule or to any schedule. By retaining the provision of House Bill 59 that delayed the onset of a formula-set Contribution Schedule until 2013, H.B. 59, § 51-1-11(I)(2), and vetoing only the language that provided for a fixed, interim Contribution Schedule, H.B. 59, § 51-1-11(I)(6), the Governor's veto, perhaps inadvertently, left a void, as there is no Contribution Schedule for 2012. Without a Contribution Schedule in 2012, there is no basis with which to determine employer contributions to the unemployment fund by established employers for calendar year 2012. These employers have effectively been exempted from what has been a mandatory contribution requirement since the Act's inception. *See* § 51-1-3 ("[T]he general welfare of the citizens of this state requires . . . the compulsory setting aside of unemployment reserves."); *see also* § 51-1-9(A) ("Contributions shall accrue and become payable by each employer for each calendar year in which he is subject to the payments of contributions under the Unemployment

---

[1]In addition, she deleted the "and" that preceded the vetoed provision of the subsection, making the remainder of Section 51-1-11(I) grammatically correct.

Compensation Law."); § 51-1-11(F) (2010) ("For such an [established] employer, the contribution rate shall be determined pursuant to Subsection I of this section on the basis of the employer's record and the condition of the fund.").

### C.    *A Writ of Mandamus Is Proper in this Case*

**{8}**    This Court has ruled on the constitutionality of a governor's veto in past cases involving writs of mandamus. *See State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 364, 524 P.2d 975, 980 (1974). Initially, we did not address the merits of the petition for writ of mandamus filed in this case because, in her executive message, the Governor expressed her intent to include the Act on the agenda of the 2011 Special Session on redistricting. Because the special session took place before the effective date of the language vetoed by Governor Martinez, addressing the issue during the special session would have been a plain, speedy, and adequate remedy in the ordinary course of law that was available to Petitioners; therefore, a writ of mandamus was not warranted. *State ex rel. Coll v. Johnson*, 1999-NMSC-036, ¶ 12, 128 N.M. 154, 990 P.2d 1277 ("Mandamus is a drastic remedy to be invoked only in extraordinary circumstances" and when there is not "a plain, speedy and adequate remedy in the ordinary course of law." (internal quotation marks and citations omitted)). In addition, this was not a situation in which legislators would have had to override the Governor's veto by a two-thirds majority pursuant to Article IV, Section 22 of the New Mexico Constitution. While a veto override may not constitute an adequate remedy if a veto is unconstitutional, only a majority of the Legislature would have needed to vote favorably on legislation introduced during the special session in order for it to reach the Governor's desk.

**{9}**    When no resolution was reached on the issue during the 2011 Special Session, Petitioners asserted that their petition was ripe and asked us to rule on the merits. The next legislative session in January 2012 will not start, much less produce a possible remedy, until after the language at issue in House Bill 59 takes effect. Therefore, we have exercised our discretion to decide the merits of the petition.

### D.    *The Veto Is Invalid Because What Remained Resulted in an Unworkable and Incomplete Act*

**{10}**    Petitioners assert two arguments in support of their petition for a writ of mandamus invalidating Governor Martinez's partial veto and reinstating House Bill 59 as written by the Legislature. First, House Bill 59 is not a bill appropriating money, and therefore the Governor does not have the authority to partially veto the legislation. Second, if House Bill 59 is a bill appropriating money, Governor Martinez's partial veto is invalid because it distorts the legislators' intent in enacting House Bill 59. In response, the Governor contends that House Bill 59 is a bill appropriating money, and that because she struck the entirety of Section 51-1-11(I)(6), the veto is constitutional.

**{11}**    The Governor has constitutional authority to approve or disapprove any part or item

of any bill appropriating money. N.M. Const. art. IV, § 22. Any bill appropriating money is not synonymous with the General Appropriation Act. *State ex rel. Dickson v. Saiz*, 62 N.M. 227, 233-34, 308 P.2d 205, 209 (1957). This partial veto power permits the Governor to meaningfully participate in the appropriations process. *Id*. Significantly, the Legislature cannot circumvent the Governor's veto power by the careful drafting of legislation. *Kirkpatrick*, 86 N.M. at 364, 524 P.2d at 980 ("The Legislature may not properly abridge that power by subtle drafting of conditions, limitations or restrictions upon appropriations."). Conversely, the Governor may not exercise the partial veto power to "in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences." *Id*. at 365, 524 P.2d at 981.

{12}    Ordinarily, we would first answer whether the bill being partially vetoed is an appropriation bill, because if the bill does not appropriate money, the Governor does not have constitutional authority to partially veto the bill. *See Chronis v. State ex rel. Rodriguez*, 100 N.M. 342, 344, 670 P.2d 953, 955 (1983) ("[B]ecause the Act does not appropriate money, we hold that the Governor's veto power was invalidly exercised in violation of Article IV, Section 22 [of the New Mexico Constitution]."). However, the dispositive and perhaps less complex question in this case is whether the Governor's partial veto of House Bill 59 destroyed the whole of the item or part, leaving a workable piece of legislation without creating legislation that is inconsistent with the Act. Therefore, for purposes of this Opinion, we assume, without deciding, that House Bill 59 is a bill appropriating funds.

{13}    To begin the analysis, we acknowledge that the Governor of the State of New Mexico has broad veto authority. *State ex rel. Coll v. Carruthers*, 107 N.M. 439, 442, 759 P.2d 1380, 1383 (1988) ("New Mexico differs from most other states with item-veto provisions because it allows the broadest possible veto authority by additionally providing authority to veto 'parts', not only 'items'."). This authority stems from the Constitutional Convention that "specifically adopted a proposal which increased the partial veto power to parts of bills of general legislation which contained incidental items of appropriation." *Saiz*, 62 N.M. at 235, 308 P.2d at 210 (internal quotation marks and citation omitted).

{14}    We have previously considered the contours of this power. We recognized in *Saiz* that this ability to veto parts was a "quasi-legislative" function.

> Our Constitution does not, necessarily, foreclose the exercise by one department of the state of powers of another but contemplates in unmistakable language that there are certain instances where the overlapping of power exists. Indeed, when the Governor exercises his right of partial veto he is exercising a quasi-legislative function.

62 N.M. at 236, 308 P.2d at 211. We held in *Kirkpatrick*, however, that the Governor could overstep such power by eliminating substantive parts of a bill.

> The power of partial veto is the power to disapprove. . . . It is not the

7

power to enact or create new legislation by selective deletions. . . . Thus, a partial veto must be so exercised that it eliminates or destroys the whole of an item or part and does not distort the legislative intent, and in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences.

86 N.M. at 365, 524 P.2d at 981.

{15}    Thus, a Governor uses the partial veto properly if the veto eliminates or destroys the whole of an item or part, otherwise leaving intact the legislative intent regarding the remaining provisions in the bill. All language that relates to the subject to be proscribed by the veto must be vetoed for the veto to be valid. In addition, the remaining legislation must continue to be a workable piece of legislation.

{16}    For example, in *Saiz*, we held that New Mexico Governor John E. Miles constitutionally vetoed a "part" of a bill appropriating money. 62 N.M. at 236, 308 P.2d at 210-11. The part of the bill that he vetoed consisted of several non-consecutive provisions, all relating to the same purpose. Each of the vetoed subsections and portions of subsections was part of the amended bill's language that were enacted to permit Sunday alcohol sales. To illustrate, Governor Miles's message stated that he had vetoed:

> All part [sic] of sub-section (a) of Section 1204, which reads as follows:

> Provided, however, that the licenses of retailers shall allow them to sell and deliver alcoholic liquors, and the licenses of dispensers and clubs shall allow them to sell, serve, deliver and permit the consumption of alcoholic liquors on their licensed premises on Sundays between the hours of 2:00 P.M. and 11:00 P.M. in municipalities within or composing local option districts, and in counties composing local option districts, outside of the limits of the municipalities therein situated, if a majority of all votes cast at an election in any such municipality or county are in favor of the sale of alcoholic liquors on Sundays in each municipality or county.

> All of sub-section (b) of Section 1204.

> All of sub-section (c) of Section 1204.

> That part of sub-section (d) of Section 1204, which reads as follows:

> or on any Sunday between 2:00 A.M. and 2:00 P.M. and between 11:00 P.M. and midnight;

> All that part of sub-section (e) of Section 1204, which reads as

8

follows:

> in any municipality or county which has not voted in favor of the sale
> of alcoholic liquor on Sundays therein, under the provisions of this Act.

*Id.* at 232, 308 P.2d at 208 (internal quotation marks omitted) (quoting the Governor's veto message).

**{17}** We held that it did not matter that the veto eliminated entire subsections, portions of other subsections, or portions of the bill that were not adjacent to one another. *Id.* at 236, 308 P.2d at 210-11. Each of the vetoed provisions needed to be eliminated in order for the Governor to fully amend the bill so as not to permit alcohol sales on Sunday. Each provision that was vetoed made up the "part" of the bill that permitted alcohol sales on Sunday.

> [Governor Miles] went through the bill before him with meticulous care, lifting from it, wherever found, the part or parts germane to the subject about to be proscribed, and which together, made up a rounded whole, and took such part or parts from the bill. It mattered not where in the bill they rested if they constituted an integral part of the subject being partially vetoed—out they came!

*Id.* at 237, 308 P.2d at 212 (per curiam, on motion for rehearing). The "challenged act [was] not invalid or unconstitutional on any of the grounds raised against it, including the claim that the act [was] bad because the partial veto applie[d] to part of a section or sub-section." *Id.* at 236, 308 P.2d at 210. Had the Governor only stricken one or two of the provisions that referred to alcohol sales, leaving other related provisions intact, the veto would not have been complete and would have otherwise distorted the remaining provisions in a way that made the remaining bill unworkable. For example, had the Governor not vetoed the portions of Subsections (d) and (e), the legislation would have been ambiguous regarding what was meant by reference to Sunday liquor sales.

**{18}** We adopted our approach in *Saiz* by considering the approach taken by several other state supreme courts. *See id.* For example, in *Cascade Telephone Co. v. Tax Commission of Washington*, one of the primary cases upon which we relied in *Saiz*, the Washington Supreme Court considered state constitutional language that allowed a governor to partially veto a "section or sections, item or items." 30 P.2d 976, 977 (Wash. 1934). Despite the use of the word "sections" in the Washington Constitution, the Washington Supreme Court concluded that the reference did not mean the "sections" designated by the legislature, but rather the parts of the bill related by subject matter: "By the artful arrangement of the subject-matter and an arbitrary division into sections, the Governor's power might be unduly limited or enlarged without reason." *Id.* The Washington Supreme Court concluded that the Washington Constitution's reference to "sections" intended groupings based on subject matter and not simply what was termed a "section" in the passed legislation. *Id.* Likewise, Governor Miles's veto in *Saiz* eliminated a "part" of the bill, despite the noncontiguous

9

provisions, due to the vetoed provisions' shared subject matter. 62 N.M. at 236, 308 P.2d at 210-11.

**{19}** In *Saiz* we also relied on Wisconsin jurisprudence because the Wisconsin Constitution has a partial veto provision almost identical to New Mexico's. 62 N.M. at 235, 308 P.2d at 210. In *State ex rel. Wisconsin Telephone Co. v. Henry*, 260 N.W. 486 (Wis. 1935), the Wisconsin governor had vetoed portions of a bill that authorized a certain tax and appropriated the revenues for emergency relief. *See State ex rel. Sundby v. Adamany*, 237 N.W.2d 910, 915 (Wis. 1976) (describing the facts underlying the *Henry* dispute). The vetoed portions declared the bill's intent and created an agency to administer the fund. *Id*. The Wisconsin Supreme Court held that the constitution's reference to "part or parts" empowered the governor to veto any part or parts of an appropriation bill, "regardless of their nature, unless they constitute inseparable conditions or provisos upon the particular appropriation involved." *Id*. Inseparability was not a concern in *Henry* because there was no "expressly stated connection between the parts disapproved and the parts which were approved by the Governor." 260 N.W. at 491. The Wisconsin Supreme Court in *State ex rel. Martin v. Zimmerman*, 289 N.W. 662 (Wis. 1940) later applied the *Henry* separability test for the completeness of a veto, holding that a veto was proper because it left behind "an effective and enforceable law on fitting subjects for a separate enactment by the legislature." *Martin*, 289 N.W. at 665.

**{20}** The Wisconsin Supreme Court's opinion in *Adamany* is also instructive. In *Adamany*, the Wisconsin governor vetoed several provisions in a bill appropriating money, each of which required five percent of the electors from towns, villages, cities, and counties to sign and file a petition in order for the respective governing bodies to hold a referendum vote on particular tax increases. 237 N.W. at 911-12. The effect of the governor's vetoes was that the governing bodies of towns, villages, cities, and counties would *always* be required to hold a referendum in order to increase that particular tax, not just when five percent of the voters in the particular jurisdiction signed a petition requesting a referendum. *Id.* at 912. The Wisconsin Supreme Court upheld the veto because "even if the result effectuates a change in legislative policy, *as long as the portion vetoed is separable and the remaining provisions constitute a complete and workable law,*" the veto is valid. *Id.* at 916 (emphasis added). In addition, the vetoes were upheld because they did not cause any inconsistency within the rest of the bill. In fact, the court commented that the governor's vetoes had eliminated confusion that had existed in the legislation prior to the veto. *Id.* at 918 ("Moreover, the vetoes resolved an inconsistency created by the sections immediately preceding each challenged section.").

**{21}** In this case, the Governor's veto message expressed disapproval of House Bill 59's "arbitrary" Contribution Schedule, Schedule 3, for 2012. The veto deleted only the language that set the Contribution Schedule to Schedule 3 for 2012 and retained the language that delayed the sunrise of the formula-based Schedule until 2013. The Governor's veto, however, did not return the Act to its former language, providing for the default, formula-based Schedule, or to any schedule for 2012. Rather, the veto arbitrarily eliminated the

Contribution Schedule variable used to determine established employer contributions to the unemployment compensation fund for the year 2012. Unlike the veto in *Saiz*, the Governor's veto did not completely delete all the provisions in House Bill 59 that would have addressed the concerns described in the Governor's veto message. Instead, the Governor's veto deleted a portion of the bill that specifically related to another portion of the bill that was retained: the "after 2012" language found in House Bill 59, Section 51-1-11(I)(2), had been added to delay the formula-based Contribution Schedule during 2012, the year for which the vetoed provision had provided an interim, fixed Contribution Schedule.

**{22}** Here, unlike the veto upheld in *Adamany*, the Governor's veto creates, rather than eliminates, inconsistencies within both House Bill 59 and the Act as a whole. As mentioned earlier in this Opinion, the Act's purpose statement provides that employer contributions will be "*compulsory*," § 51-1-3 (emphasis added), and other provisions of House Bill 59 provide that established employers' contribution rates "*shall* be determined . . . on the basis of the employer's record and the condition of the fund as of the computation date for the calendar year," H.B. 59, § 51-1-11(F) (emphasis added). The Governor's veto eliminates established employers' contributions for 2012 by making it impossible to determine the 2012 employer contribution rate. By only deleting certain language, the setting of the 2012 Contribution Schedule to Schedule 3, and leaving other phrases relating to the same subject matter intact, the delay of a formula-based Contribution Schedule until after 2012, the Governor's veto impermissibly left an incomplete and unworkable Act.

**{23}** Because we conclude that the Governor's partial veto had the effect of altering the remainder of the Act by nullifying its application to established employers in 2012, we hold that the veto was unconstitutional. Both parties have urged us to reinstate House Bill 59 as passed by the Legislature in the event we conclude that the partial veto is invalid. Accordingly, we issue the writ, reinstating House Bill 59 as passed by the Legislature.

## III.    CONCLUSION

**{24}** We hold that the partial veto to House Bill 59 is unconstitutional because after the Governor vetoed the language regarding the increase to the 2012 Contribution Schedule from Schedule 1 to Schedule 3, what remained was an unworkable piece of legislation. For the foregoing reasons, we hold that the partial veto to House Bill 59 is constitutionally invalid. Accordingly, we issue a writ of mandamus ordering the reinstatement of House Bill 59 as passed by the Legislature.

**{25}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

11

_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**RODERICK KENNEDY, Judge**
**Sitting by designation**


**Topic Index for *State ex rel. Stewart v. Martinez*, Docket No. 33,028**

| | |
|---|---|
| **GV** | **GOVERNMENT** |
| GV-AP | Appropriations |
| GV-EB | Executive Branch |
| GV-PF | Public Funds |
| | |
| **RE** | **REMEDIES** |
| RE-EO | Extraordinary Writs |
| RE-WM | Writ of Mandamus |
| | |
| **ST** | **STATUTES** |
| ST-LI | Legislative Intent |